**UNITED STATES of America, Appellee,**

v.

**Leonard George DURANT, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Nadine FARRIS, Appellant.**

**Nos. 83–1171, 83–1172.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1983.

Decided March 29, 1984.

L. Patrick O'Brien, Kansas City, Mo., for appellant Durant.

Robert G. Ulrich, U.S. Atty., J. Whitfield Moody, Asst. U.S. Atty., Kansas City, Mo., for appellee.

R. Thomas Day, Asst. Federal Public Defender, East St. Louis, Ill., for appellant Farris.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

HEANEY, Circuit Judge.

Leonard George Durant and Nadine Farris appeal from their convictions for bank robbery and aiding and abetting bank robbery in violation of 18 U.S.C. §§ 2 and 2113(a) & (d) (1982). They each raise separate issues pertaining to the admission of evidence and the conduct of the trial. After reviewing the record and each of their arguments on appeal, we affirm.

## BACKGROUND

On June 25, 1982, at approximately 5:40 p.m., three masked and armed men robbed the United Missouri Bank South in Kansas City, Missouri, of just over $7,100. They fled with one or two others in a red station wagon. A report went out over the police radio describing the suspects as black males.

A short while later, Kansas City police officer Francey Chapman stopped a white and gold Buick in the general vicinity of the bank robbery. The automobile contained Rita Williams, the driver, and Farris, a passenger, both black females. Upon frisking Farris, Officer Chapman felt a hard object under her blouse. She removed it and discovered a large roll of money. Chapman then searched the automobile and found two zipped bags containing several handguns and a bundle of loose cash. A backup officer placed the two women under arrest.

Later that evening, the police arrested Terence Swinney and Torrance Henderson at Williams' apartment. Swinney soon confessed his involvement in the bank robbery and agreed to testify for the government in exchange for dismissal of the charges against him. He implicated Williams, Farris, Henderson, a man known to him only as "C-note," and a man known to him only as "L." On October 1, 1982, Swinney identified Durant in a group of photographs as "L."

Three days later, on October 4, 1982, Durant was picked up on an unrelated warrant in Kansas City, Missouri. A blue Oldsmobile resembling an automobile used in the June robbery was parked outside the apartment building where Durant was taken into custody. Durant was subsequently indicted for bank robbery. The blue Oldsmobile was impounded and photographed for evidence.

Williams was the first of the defendants to be tried. She waived her right to a jury trial, and the district court convicted her on the basis of stipulated facts. On appeal, she argued the stop of her automobile and the subsequent search violated the fourth amendment. We affirmed her conviction. *United States v. Williams*, 714 F.2d 777 (8th Cir.1983). Farris was initially tried with Henderson, but the jury could not reach a verdict as to her. We affirmed Henderson's conviction in *United States v. Henderson*, 719 F.2d 934 (8th Cir.1983). Farris was reindicted and tried with Durant on December 13, 1982. The jury found both defendants guilty on December 16, 1982. The court sentenced Durant to twenty-five years imprisonment. Farris received a fifteen-year sentence.

On appeal, Farris challenges the admission of the evidence seized from the white and gold Buick just after the robbery. She also asserts the government's closing argument improperly called attention to her failure to testify. Durant argues the trial court erred in denying his motions for severance and for acquittal. He also contests the admissibility of (1) evidence that Farris is his niece; (2) photographs of the blue

Oldsmobile that was parked outside the apartment where he was arrested; and (3) alleged hearsay evidence. For the reasons discussed below, we reject each of these arguments and affirm the convictions.

## DISCUSSION

### A. Farris's Arguments.

Farris first contends Officer Chapman stopped her and Williams without probable cause and therefore the evidence seized in the subsequent search should have been suppressed.

■ The government initially challenges Farris's standing to contest the search citing *Rakas v. Illinois*, 439 U.S. 128, 148–149, 99 S.Ct. 421, 432–433, 58 L.Ed.2d 387 (1978). *Rakas* holds that a mere passenger in an automobile ordinarily does not have the legitimate expectation of privacy necessary to challenge the search of that automobile. This case is distinguishable, however, because Farris was ordered out of the car and frisked. In fact, it was the roll of money found on her person that led to the search of the automobile. Farris can contest the legality of the stop and frisk. Any evidence attained as a direct result of an illegal stop would be inadmissible under the "fruit of the poisonous tree doctrine" of *Wong Sun v. United States*, 371 U.S. 471, 484–485, 83 S.Ct. 407, 415–416, 9 L.Ed.2d 441 (1963). *See, e.g., United States v. Jones*, 619 F.2d 494, 498 (5th Cir.1980) (suppressing physical evidence seized following an illegal stop). Lack of standing thus does not preempt Farris's suppression argument on appeal.

■ Farris loses her argument on the merits, however. In *United States v. Williams, supra*, 714 F.2d at 781, we held Officer Chapman's stop of Williams' automobile and her frisk of the occupants was a valid investigatory seizure. We affirmed the district court's finding that the stop was not based solely on the race of the automobile's occupants, but rather on a reasonable suspicion that Williams and Farris were engaged in criminal activity. We recounted the following particularized and

articulable facts which gave rise to Officer Chapman's reasonable suspicion:

Less than ten minutes before the bank robbery was reported, Officer Chapman observed a parked white and gold Buick occupied by two black women and one black man in a shopping center parking lot. Chapman noticed that the male, who was exiting from the automobile, had black gloves in his back pocket and was wearing dark blue clothing which the officer considered "unusual dress for ... a June day" because "it was warm and he was dressed very warmly." At this time, Chapman was aware that approximately one-half hour earlier two armed black men, dressed in dark blue sweat suits, had stolen a red Ford station wagon in a park less than five miles from the shopping center.

Shortly after Officer Chapman observed the Buick in the parking lot, the police radio broadcast reported that there had been an armed robbery at the Union Missouri Bank South, and directed police officers to be "[o]n the lookout for a red Ford station wagon." It was reasonable for Chapman to infer that the Ford automobile was the bank robbery getaway car and that it was the same one which had been stolen shortly before by two black men dressed similarly to the black male she had seen exiting from the white and gold Buick. When Chapman heard this report, she began to drive toward the bank, which is located about eight blocks south of the shopping center where she was parked. When Chapman spotted the white and gold Buick traveling in a direction away from the bank, she turned to follow it. Chapman, following the automobile as it turned east and then south, noticed that it contained the two black women but not the black male dressed in dark clothing that she had seen earlier. She also observed that the Buick's driver, Williams, reduced her speed and apparently signaled for a right turn on several occasions without turning: such a turn would have taken the automobile back toward the bank or an area with numerous parking places.

Shortly thereafter, the police radio broadcast reported that the suspect vehicle—the red Ford station wagon—was occupied by five black males and that it was the automobile which had been stolen shortly before the bank robbery.

*Id.* at 782.

We viewed these facts as an adequate basis for Officer Chapman's decision to stop the Buick and frisk Williams and Farris. The frisk produced a roll of bills which Farris had hidden under her clothing. We ruled this additional fact gave Chapman probable cause to search the Buick where she found handguns used in the robbery and the stolen money.

■ Farris urges us to distinguish her case from Williams' on two grounds. First, she claims Williams did not argue, as she does, that the stop of Williams' car and frisk of its occupants was a full arrest requiring probable cause, rather than an investigatory stop requiring only a reasonable suspicion. In fact, Williams did raise this argument and we rejected it holding the district court did not clearly err in finding the initial stop and frisk was an investigatory stop rather than an arrest. *Id.* at 780, n. 2. Second, Farris argues that the more complete record in her case indicates that the roll of bills found on her person was too small and neatly placed to be robbery money, thus eliminating the probable cause for the search. Here is where *Rakas* becomes relevant. As long as the initial stop and frisk was legal, Farris has no standing to contest the subsequent search of the automobile in which she was a passenger. *See Rakas v. Illinois, supra,* 439 U.S. at 148–149, 99 S.Ct. at 432–433. In any event, we do not believe additional details about the amount of money or exact placement of the bills affects the finding that there was probable cause to search the automobile.

In sum, our reasoning and our reading of the facts in *Williams* compel a rejection of Farris's suppression argument in the instant case. Because reasonable suspicion supported Officer Chapman's investigatory

stop and frisk of Williams and Farris, evidence derived from the stop was admissible at Farris's trial.

■ Farris next contends that the government's closing argument improperly suggested to the jury that her failure to testify or otherwise produce evidence should have been held against her. In his argument to the jury, government counsel called their attention to the portions of the accomplice Terence Swinney's testimony which he characterized as "not substantially disputed," "unchallenged," and "not contradicted." In four pages of transcribed argument, government counsel used these expressions no less than sixteen times. Although in other circumstances this style of presentation may cross the boundaries of permissible argument, in the context of this particular argument and the evidence produced at trial, we hold it was not improper.

■ A direct comment by the government on a defendant's failure to testify violates the fifth amendment privilege against self-incrimination. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). More ambiguous comments such as references to "uncontradicted testimony" may constitute error when the statements either (1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally and necessarily take them as a comment on the defendant's failure to testify. *E.g., Williams v. Wainwright*, 673 F.2d 1182, 1184 (11th Cir.1982); *United States v. Buege*, 578 F.2d 187, 188 (7th Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Sanders*, 547 F.2d 1037, 1042 (8th Cir.1976), *cert. denied*, 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977). Both tests require attention to the context of the prosecutor's remarks—the argument itself, and the larger context of the evidence introduced at trial. *Williams v. Wainwright, supra*, 673 F.2d at 1184.

In the instant case, the government explains its remarks as a response to defense attempts to undermine and impeach Swinney's testimony. The record supports this explanation. The defense vigorously cross-examined Swinney concentrating on the areas where he had contradicted himself in prior testimony. Examination of the full text of the prosecution's final argument reveals that the litany of "no contradictions" was used to characterize the unchallenged portions of Swinney's testimony. Given this support in the record, we conclude that the prosecutor's closing remarks were intended to counter the defense strategy, not call attention to Farris's failure to testify.

In view of the record, we also conclude the jury would not have "naturally and necessarily" viewed the prosecutor's remarks as a comment on the defendant's failure to testify. The jury must have been aware of the defense strategy to impeach Swinney after listening to the cross-examination of his testimony. By the final argument, they were as likely, if not more likely, to view the government's remarks as a response to the impeachment attempt as they were to view these remarks as a comment upon the defendant's silence. We thus hold that in the context of this case, the prosecution's remarks were not improper.[1]

## B. Durant's Arguments.

Durant raises a suppression issue separate from the one raised by Farris. After taking him into custody on a warrant unrelated to the bank robbery, two officers escorted Durant out of the apartment building to where the squad car was parked in the street. Without first informing Durant of his *Miranda* rights, one of the officers asked him if he had a car parked nearby. Durant indicated the blue Oldsmobile, and one of the officers noted the license number. Later when Durant

---

1. Because we hold the argument was proper, we need not reach the question of whether any error would be harmless. We agree with Justice Steven's observation in *United States v. Has-* *ting*, — U.S. —, 103 S.Ct. 1974, 1984, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring in the judgment), that such a determination is an extremely difficult one for an appellate court.

was linked to the bank robbery, an FBI agent asked the local authorities to impound and photograph the automobile. Prior to trial, the district court suppressed Durant's statement acknowledging possession of the Oldsmobile because Durant had not been informed of his rights when the officers elicited the statement.[2] The trial court admitted the photographs of the Oldsmobile and evidence linking it to Durant and to the robbery, however, on the theory that the officer's observation of the Oldsmobile prior to the arrest supplied a source of this evidence independent of Durant's suppressed statement. Durant challenges this ruling.

■ We agree with Durant that the arresting officer's observation of a blue Oldsmobile on the street outside the apartment building prior to Durant's arrest does not evince an independent basis for linking the car to Durant. Other cars were parked on the street that day. In their testimony, the officers gave no reason for thinking the Oldsmobile belonged to Durant at the time of arrest. We nevertheless uphold the trial court's ruling on admissibility because we find that Durant's connection to the blue Oldsmobile would have been inevitably discovered once the officers became aware of Durant's alleged participation in the bank robbery.

■ Evidence derived from illegal police conduct is inadmissible under *Wong Sun v. United States, supra,* 371 U.S. at 484, 83 S.Ct. at 415. This Circuit has long recognized two exceptions to this exclusionary rule where (1) the evidence is also traceable to a source independent of the illegal conduct, and (2) the connection between the evidence and the illegal conduct is so attenuated that the "taint" has dissipated. *See, e.g., United States v. Kelly,* 547 F.2d 82, 85 (8th Cir.1977). We have recently recognized a third exception when the evidence would have been inevitably discovered absent the illegal conduct. *United States v. Apker,* 705 F.2d 293, 307 (8th Cir.1983), *vacated in part, United States v. Fitzger-*

*ald,* 724 F.2d 633 (8th Cir.1983) (en banc), *cert. denied,* — U.S. ——, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). *See also United States v. Kandik,* 633 F.2d 1334, 1336 (9th Cir.1980); *United States v. Bienvenue,* 632 F.2d 910, 913–914 (1st Cir.1980); *United States v. Brookins,* 614 F.2d 1037, 1042 n. 2 (5th Cir.1980).

In the instant case, the blue Oldsmobile would eventually have been traced to Durant. The FBI knew from Swinney's testimony that a third car, a blue Oldsmobile, was involved in the robbery. When Durant was arrested, he produced a driver's license and a traffic citation both belonging to his brother, Edwin Durant. Tracing the citation or the license would have led the authorities to the blue Oldsmobile which was registered to Edwin Durant. The photographs of the blue Oldsmobile and testimony linking that automobile to Durant were therefore admissible under the inevitable discovery exception of the exclusionary rule.

■ Durant also argues that the trial court abused its discretion in not granting his pretrial severance motion. We hold that he has not demonstrated the clear prejudice necessary to warrant severance. Regardless of the relative strength of the evidence against each codefendant, severance would only be required in the circumstances of this case if the jury could not reasonably be expected to compartmentalize the evidence relating to each defendant. *United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981) (and cases cited therein), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). Durant contends the jury could not separate the stronger evidence against Farris from the evidence against him, primarily because the government established that Farris was Durant's niece. We do not believe that this evidence of a family relationship between the two defendants would so undermine the jury's ability to assess the evidence pertaining to each defendant. Accomplice Terence Swin-

---

**2.** The government has not challenged the district court's ruling suppressing Durant's state- ment. We have no reason to review that ruling here.

ney testified as to both defendants' involvement. Different facts corroborated Swinney's testimony for each defendant: Farris's arrest with the money; Durant's possession of the blue Oldsmobile at the time of his arrest. We find no abuse of discretion in the district court's denial of Durant's severance motion.

█ Durant also makes a related argument that the trial court erred in not excluding the evidence of his family relationship with Farris as irrelevant under Fed.R. Evid. 402 or overly prejudicial under Fed.R. Evid. 403. The trial court determined this evidence "has a logical bearing on what is important in this case, which is whether these people did, in fact, jointly agree and take part in this enterprise." We do not feel that the trial court abused its discretion in receiving this evidence. The defendants' relationship lent some weight to Swinney's story that they jointly planned and participated in the bank robbery.

█ Durant raised a hearsay objection to the admission of one piece of evidence. Swinney testified on direct examination that at the time of his arrest, he knew Leonard Durant only by the initial "L." To impeach Swinney, the defense put on Detective Clarence Luther who testified that Swinney told him a "Leonard L" was involved in the robbery right after his arrest. To test the witness's memory, the government on cross-examination asked Luther whether he got the name "Leonard" from Rita Williams. Luther responded, "Yes." Durant claims this evidence is inadmissible hearsay. It is clear from the context, however, that the testimony was not offered for the truth of the matter asserted, and was thus admissible as non-hearsay.

█ Finally, Durant asserts the trial court erred in not granting his motion for acquittal because there was insufficient evidence to support his conviction. When reviewing such a challenge, we, of course, view the evidence in a light most favorable to the government, *e.g.*, *United States v. Yancy*, 688 F.2d 70, 71 (8th Cir.1982), and accept all reasonable inferences from the

evidence which support the verdict, *United States v. Johnson*, 701 F.2d 752, 753 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Swinney's testimony was the linchpin of the government's case. He positively identified Durant as one of the participants in the robbery. In addition, the jury was able to compare photographs of the robber in a blue sweatsuit with Durant wearing the same sweatsuit. Added to this is the evidence that Durant drove a blue Oldsmobile similar to one driven in the robbery. We think this evidence sufficient to support Durant's conviction.

We have reviewed each defendant's contentions on appeal, and have found them without merit. Accordingly, the convictions are affirmed.